UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

PAMELLA CIBERAY,

               Plaintiff,

v.

L-3 COMMUNICATIONS
CORPORATION MASTER LIFE
AND ACCIDENTAL DEATH AND
DISMEMBERMENT INSURANCE
PLANS et al.,

               Defendants.

Case No. 3:12-cv-1218-GPC-MDD

**ORDER REVERSING
DEFENDANT L-3
COMMUNICATIONS
CORPORATION MASTER LIFE
AND ACCIDENTAL DEATH AND
DISMEMBERMENT
INSURANCE PLANS' DENIAL
OF BENEFITS**

**(ECF NOS. 21, 22)**

## INTRODUCTION

      In this ERISA case, Plaintiff seeks review of a decision to deny her claim for benefits under her now deceased husband's accidental death and dismemberment insurance policy. Plaintiff's husband, Mr. Ciberay, died nine days after sustaining pelvic fractures incurred as a result of falling down a set of stairs while intoxicated. The core issue is whether Defendant, through its delegees, abused its discretion in denying Plaintiff's claim for benefits pursuant to the policy's intoxication exclusion.

      The review of Defendant's decision to deny benefits comes before the Court via the parties' cross-motions for summary judgment. The Court finds the motions suitable for disposition without oral argument. *See* CivLR 7.1.d.1; *see also Duncan v. Hartford*

*Life & Accident Ins. Co.*, 2013 WL 506465, at *1 (E.D. Cal. Feb. 8, 2013) (finding oral argument unnecessary where decision in ERISA case based on review of administrative record).

After a careful review of the parties' briefs, administrative record, and applicable law, the Court will **DENY** Defendant's Motion for Summary Judgment and **GRANT** Plaintiff's Motion for Summary Judgment. The Court will thus **REVERSE** Defendant's denial and require payment of Plaintiff's claim.

## BACKGROUND

### I.    The Plan & Policy

Through his employer, Plaintiff's husband enrolled in the defendant L-3 Communications Corporation Master Life and Accidental Death and Dismemberment Insurance Plan ("Plan" or "Defendant"). The Plan is an employee welfare general plan governed by the Employee Retirement Income Security Act ("ERISA"). The Plan is funded by an insurance policy ("Policy"), which American International Life Assurance Company of New York ("AIG") issued to L-3 Communications Corporation, the Plan Sponsor and Administrator. Plaintiff's claim for benefits was processed by AIG through its agent Chartis Claims, Inc. ("Chartis"). Notwithstanding this chain of entities, Defendant agrees it is fully responsible for the decision to deny Plaintiff's claim for benefits.

The Plan provides that the Plan Administrator, L-3 Communications Corporation, has delegated to AIG the full and complete discretionary authority and responsibility to decide all questions of eligibility for benefits under the Plan. The Plan further provides that AIG's decisions (in this case, through Chartis) are final and binding on all persons to the full extent permitted by law.

The Policy provides that, "[i]f injury to the insured person results in death within 365 days of the dates of the accident that caused the Injury, the Company will pay 100% of the Principal Sum" of benefits. "Injury" is defined as a "bodily injury caused by an accident occurring while this Policy is in force as to the person whose

injury is the basis of claim and resulting directly and independently of all other causes in a covered loss." The Policy contains an exclusion whereby the Policy "does not cover any loss caused in whole or in part by, or resulting in whole or in part from the following . . . (5) the Insured Person being under the influence of drugs or intoxicants, unless taken under the advice of a Physician."

The Plan provides, "In general, ERISA preempts state law. However, ERISA does not preempt state laws that regulate insurance. The Plan will always be construed to comply with applicable federal and state law." Similarly, the Policy provides, "This Policy is governed by the laws of the state in which it is delivered." The Policy further provides, "Conformity with State Statutes. Any provision of this Policy which, on its effective date, is in conflict with the statutes of the state in which this Policy is delivered is hereby amended to conform to the minimum requirements of those statutes."

The Policy was in full force and effect at the time Plaintiff's husband died. All premiums had been paid, and any conditions required for issuance of benefits under the Policy had been fulfilled. Plaintiff is named as the primary beneficiary of the Policy, which provides $620,000 in accidental death benefits.

## II.    The Accident & Medical Care

On February 7, 2010, Mr. Ciberay fell down ten or fourteen stairs at his and Plaintiff's home in Escondido, California. Plaintiff did not see her husband fall but later told an interviewer that her husband was carrying a plate and drinking glasses down the stairs and that he told her after the fall that he had missed the first or second step. Prior to his fall, Mr. Ciberay had been playing with his grandson in an upstairs room.

When paramedics arrived, Mr. Ciberay was examined and found to be "Alert and Oriented X4, with no loss of consciousness." His neuro exam revealed his pupils were equal and reactive to light and that he was able to move all four extremities on command. He was further noted to have a normal respiratory rate of 20 breaths per

minute.  He complained of pain on standing, mostly in his left pelvic region.  He admitted he had been drinking heavily related to the Super Bowl football game that day.

Plaintiff's husband was transported to the hospital where his chief complaint was described as "alcohol fall" and where his blood alcohol level was measured at .422 mg/dL or .422%.  He was admitted with a diagnosis of a left superior and inferior pubic ramus fracture with pain on standing, mostly in the left pelvic region.  Hospital records note Plaintiff's husband had a history of alcohol dependence and that his hospital admission was also for alcohol withdrawal concerns.  On the day of his admission, a physician determined he was cognitively intact, was not a surgical candidate for repair of his pelvic fractures, and that "most of [his] admission was for alcohol withdrawals," as Plaintiff's husband was reported to drink vodka intermittently on top of 2 to 3 beers a day.

On February 10, 2010, while hospitalized, Plaintiff's husband developed a fever that rose to 104 degrees.  He was noted to be delirious only on that day.  He was found to have bacterial infections that, up until the day of his death, responded well to antibiotic treatment.  Indeed, on February 14, 2010, Plaintiff's husband was downgraded from ICU to IMC, with a plan to discharge him to "rehab" after a few days of monitoring out of the ICU.

On February 16, 2010, however, Plaintiff's husband was returned to the ICU when he experienced a lapse of consciousness or possible seizure after standing up.  Persistent efforts were made to stabilize his cardiac condition, but he continued to deteriorate through the morning.  After coding twice, Plaintiff's husband died on February 16, 2010, at 12:02 p.m.

The medical examiner issued an initial external examination report following the Mr. Ciberay's death.  Initially, the cause of death was listed as hypertensive cardiovascular disease, with the following other significant conditions: alcohol abuse, pelvic fractures, obesity, and diabetes mellitus.  The manner of death was listed as an

accident.  The medical examiner later issued an amended external examination report to correct the time of death and to amend the cause of death to be complications following pelvic fractures, with the following other significant conditions: hypertensive cardiovascular disease, alcohol abuse, obesity, and diabetes mellitus.  The manner of death remained an accident.

### III.   Claim Process

Following her husband's death, Plaintiff timely submitted a claim for payment of the accidental death benefit under the Policy.  The claim listed the cause of death as "complications following pelvic fractures."  As noted above, Chartis (AIG's claims administrator) received and handled Plaintiff's claim.  Chartis acknowledged receipt of Plaintiff's claim by letter dated June 30, 2010.  Plaintiff thereafter complied with all requests for information and documentation.

The claim memo contains a summary and notes dated July 26, 2010, indicating the Policy excludes losses due to intoxication and stating that the reserve would remain at $1.00.

The claim memo contains a note dated November 4, 2010, stating in part, "Clmt fell and broke his pelvis.  It was determined that he was intoxicated at the time of the fall.  Clmt later died and the coroner related the death to the fall."

The claim memo contains a final general note dated November 18, 2010, which sets forth the information that Chartis reviewed in handling Plaintiff's claim.  Regarding the hospital discharge summary, the final general note states:

> Records indicate decedent was intoxicated and fell down the stairs.  He was found to have a pelvic fracture and was doing well.  Indicated most of his admission for alcohol concerns.  He was found to be delirious on 2/12/10 but was never intubated.  He was thought to have cirrhosis. Abdominal ultrasound 2/12/10 showed fatty liver disease but no moderate or severe cirrhosis.  He started to improve.  He was found to have staph aurreus and E. coli and was started on Keflex.  He had a lapse of consciousness or possible seizure after completing a bowel movement and getting up.  His abdomen was very distended with feculent drainage removed from the stomach.  Testing suggested a large massive pulmonary embolism and clot in right atrium.  He coded on 2/16/10, and they could not revive him.  Time of death 12:02 02/16/10.

The November 18, 2010 final general note makes the following recommendation:

> Recommend denial of accidental death benefits.  60 year old male fell down the stairs and fractured pelvis on 2/7/10.  It was determined from blood testing that Clmt had a BAC of 422 mg/dL or .422%.  BAC at this level can cause ataxia, tremors, disorientation, disturbed equilibrium and up to unconsciousness, depressed respiration, and even death. . . .  Cause of death was determined to be complications of pelvic fracture.  There is no sickness exclusion.  There is an intoxication exclusion on the policy.  Based on review of the available records, this loss was caused in whole or in part by being under the influence of intoxicants.

The claim memo contains a further note dated December 3, 2010, in which Chartis indicated it "could only identify the intoxication exclusion under this policy as far as applicable exclusions for this loss."

By letter dated December 3, 2010, Chartis notified Plaintiff that her claim was denied.  The denial letter states: "The records we reviewed indicate that your spouse died as a result of complications of a pelvic fracture with other significant conditions causing death listed to be hypertensive cardiovascular disease, alcohol abuse, obesity, and diabetes mellitus on February 16, 2010."

The denial letter further states:

> The medical records and fire department report indicate that your spouse fell down some stairs and sustained a pelvis fracture as a result of the fall on February 7, 2010 and passed away on February 16, 2010.  His blood alcohol level was determined to be 422 mg/dL, or .422% when tested at the hospital.  He admitted to drinking heavily that day.  A BAC level of .422% has the following typical effects: ataxia, tremors, disorientation, disturbed equilibrium, and can even lead to unconsciousness, depressed respiration, and death.

After quoting relevant Policy language, the denial letter provides:

> Based on our review of the available records, we determined that your spouse's death was not the direct result of a bodily injury caused by an accident resulting directly and independently from all other causes, but was caused in whole or in part by, or resulting in whole or in part from your spouse being under the influence of intoxicants.  Therefore, we must respectfully deny your claim for Accidental Death Benefits.

By letter dated February 28, 2011, Plaintiff timely appealed the denial of her claim.  In her February 28, 2011 letter, Plaintiff stated in part:

> I am not in agreement at this time with the denial of benefits – yes my husband was intoxicated at the time of his fall, but he did not die due to

intoxication.  His immediate cause of death was a pulmonary embolism that was due to the pelvic fracture.  He was not intoxicated at the time of his death so I would appreciate further clarification on this.

The letter I received stated that there is a section in the policy that states you will not pay out if the individual is under the influence of alcohol. My husband had insurance through two other insurance companies and after reviewing their policies, I find the same exclusion, yet they paid their portion of the accidental claim.

By letter dated March 14, 2011, Chartis acknowledged receipt of Plaintiff's request to appeal the prior decision.  In the same letter, Chartis further indicated it had determined a medical review by a forensic pathologist was necessary.

On or about March 14, 2011, Chartis paid a forensic pathologist $1,100 to review the claim file and to answer the following questions:

- Can you provide a detailed account of how the sequence of events in this incident resulted in Mr. Ciberay's death?

- Please describe all factors contributing to Mr. Ciberay's Death.

- Was Mr. Ciberay's death directly related to a fall he experienced on February 7, 2010?  If so, please explain.

- Was Mr. Ciberay's fall caused in whole or in part by his level of intoxication at the time?

- Did Mr. Ciberay's death result in whole or in part from his level of intoxication at the time of the fall?

- Is there any information as to what contributed to Mr. Ciberay's Death?  Please explain.

In response to the above questions, the forensic pathologist sent a letter dated March 17, 2011, to Chartis, stating:

In essence, Mr. Ciberay came to medical attention because, while he was intoxicated, he fell down the stairs and fractured his pelvis.  Most of his hospital course, at least as documented in the records sent for my review, centered on managing his acute alcohol withdrawal and complication of his chronic alcoholism.  Some of his complications (such as the apparent small bowel obstruction) could certainly have been related to the management of his pain.  He also apparently developed aspiration pneumonia and eventually respiratory failure.  He appeared to be improving, albeit slowly, up until the day of his death.  An echocardiogram performed just before death reportedly showed findings very suggestive of a massive pulmonary embolism.  Since a complete autopsy was not performed, this was not confirmed.

The pre-hospital factors that played a role in Mr. Ciberay's death were

pelvic fractures from the fall, acute alcohol intoxication, chronic alcoholism, diabetes, and hypertension.  Complicating factors that developed in the hospital were aspiration pneumonia, small bowel obstruction, and renal failure (of note, his creatinine already appeared slightly elevated at admission).  Based on the echocardiogram, it appears that the complication most closely linked to causing his death was a massive pulmonary embolism.

I would agree with the amended death certificate that the **complications of the pelvic fractures from the fall** were the direct cause of Mr. Ciberay's death.   Though autopsy confirmation would have been desirable, the apparent presence of a massive pulmonary embolism would most likely have been a result of the decreased mobility that occurred as a result of the fractures.  Mr. Ciberay's alcoholism was clearly a very significant factor in causing his death.  His very high blood alcohol at the time of admission would have to be regarded as playing a role in causing his fall.  His chronic alcoholism very clearly and significantly complicated the medical management of his fractures—so much so that his discharge/death summary stated, "most of his admission was for alcohol withdrawal concerns."

Based on all the information provided for my review, I would have certified the cause of death as *cardiorespiratory complications of decreased mobility* due to *pelvic fractures* due to *fall*.  *Acute alcohol intoxication at the time of injury; complication of chronic alcoholism, in withdrawal*; *diabetes*; and *hypertension* would be listed as other significant conditions.  The manner of death would be *accident*.

After March 17, 2011, the claim memo does not mention the substance of the forensic pathologist's report.  The reserve, however, was raised from $1 to $310,000 pending review and decision on appeal.  The claim file was sent to the ERISA Appeal Committee, which thereafter voted to deny the claim for the same reasons outlined in the original December 3, 2010 denial letter.  Plaintiff thereafter timely filed this suit.

## DISCUSSION

## I.    Legal Standard

### A.    Summary Judgment

Normally, summary judgment is appropriate if the evidence presented "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir.2002).  In the Ninth Circuit, however, "where the abuse of discretion standard applies in an ERISA benefits denial case, a motion for summary judgment is merely the conduit to bring the legal question before the district

court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009) (internal quotation marks omitted).

## B.   Abuse of Discretion

### 1.   General Standard

"Where an ERISA plan confers discretionary authority upon a plan administrator to determine eligibility for benefits, [courts] generally review the administrator's decision to deny benefits for an abuse of discretion." *Nolan*, 551 F.3d at 1153 (internal quotation marks omitted) (*citing Metro. Life Ins. Co. v. Glenn ("MetLife")*, 554 U.S. 105, 111 (2008)). "The abuse of discretion standard requires reversal of the findings of the Plan Administrator if they are found to be arbitrary and capricious." *Shikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 960 (9th Cir. 2001).

An ERISA administrator abuses its discretion if it "(1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005). A plan administrator's error of law also constitutes an abuse of discretion. *Shikore*, 269 F.3d at 960-61.

The decision of an ERISA plan administrator should be upheld "if it is based upon a reasonable interpretation of the plan's terms and was made in good faith." *Estate of Shockley v. Alyeska Pipeline Serv. Co.*, 130 F.3d 403, 405 (9th Cir. 1997); *see also Clark v. Washington Teamsters Welfare Trust*, 8 F.3d 1429, 1432 (9th Cir. 1993) ("Our inquiry is not into whose interpretation is more persuasive, but whether the Plan administrator's interpretation is unreasonable.") (*quoting MacDonald v. Pan Am. World Airways, Inc.*, 859 F.2d 742, 744 (9th Cir. 1988)).

Here, there is no dispute that the Plan confers discretionary authority on the Plan Administrator to determine eligibility for benefits; that the Plan Administrator delegated its discretionary authority to AIG; and that AIG evaluated and denied

1  Plaintiff's claim through its claims administrator, Chartis.  Thus, an abuse of discretion

2  standard applies to Defendant's decision to deny Plaintiff's claim for benefits.

3             **2.     Contours of Standard**

4         Where a plan administrator operates under a conflict of interest, a court must

5  weigh the conflict "*as a factor* in determining whether there is an abuse of discretion."

6  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1988).  A conflict of interest

7  exists where "a plan administrator both evaluates claims for benefits and pays benefits

8  claims."  *MetLife*, 554 U.S. at 112; *see also Montour v. Hartford Life & Acc. Ins. Co.*,

9  588 F.3d 623, 629-30 (9th Cir. 2009).  Where such a bias exists, the abuse of discretion

10  standard should be "tempered with skepticism."  *Nolan*, 551 F.3d at 1155.

11         Such a conflict "should prove more important (perhaps of great importance)

12  where circumstances suggest a higher likelihood that it affected the benefits decision,

13  including but not limited to, cases where an insurance company administrator has a

14  history of biased claims administration."  *MetLife*, 554 U.S. at 117.   Indeed,

15         a court also may weigh a conflict more heavily if: the administrator
       provides inconsistent reasons for denial; fails to investigate a claim
16     adequately or ask the plaintiff for necessary evidence; fails to credit a
       claimant's reliable evidence; has repeatedly denied benefits to deserving
17     participants by interpreting plan terms incorrectly; or by making decisions
       against the weight of evidence in the record.
18

19  *Lavino v. Metro. Life Ins. Co.*, 779 F. Supp. 2d 1095, 1105 (C.D. Cal. 2011) (*citing

20  Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968-69 (9th Cir. 2006)).

21         Such a conflict "should prove less important (perhaps to the vanishing point)

22  where the administrator has taken active steps to reduce its potential bias and to

23  promote accuracy, for example by walling off claims administrators from those

24  interested in firm finances, or by imposing management checks that penalize inaccurate

25  decision making irrespective of whom the inaccuracy benefits."  *MetLife*, 554 U.S. at

26  117.

27         Still, "conflicts are but one factor among many that a reviewing judge must take

28  into account."  *Id.* at 116.  "[W]hen judges review the lawfulness of a benefit denial,

they will often take account of several different considerations of which a conflict of interest is one." *Id.* at 117. "[A]ny one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id.*

Here, the record reflects that, in denying Plaintiff's claim, Defendant (through its delegees) operated under an inherent structural conflict of interest because it had complete authority to both evaluate and pay claims.

Defendant asserts the record is devoid of any evidence of a history of biased claims administration, inconsistent reasons for denying Plaintiff's claim, or a failure to investigate Plaintiff's claim.

Plaintiff contends the record demonstrates Defendant never intended to investigate Plaintiff's claim or consider payment of it at any time during the claims process. In support, Plaintiff asserts that, "from the outset, Defendant's representatives repeatedly referenced or quoted the intoxication exclusion," and "shortly after the claim submission, Chartis set its claim reserve at a mere $1.00 – a sum that was raised to half the policy amount after the appeal was filed." Plaintiff also asserts "there is no indication in the [a]dministrative record that the Plan Administrator ever consulted or researched California law at any point during the claims or appeal process to determine if the intoxication exclusion was enforceable." Plaintiff similarly asserts there is no indication in the record that Defendant ever sought to discover the cause of Mr. Ciberay's fall. Plaintiff asserts Defendant ignored evidence that Mr. Ciberay was alert and oriented when paramedics arrived, instead relying exclusively on his blood alcohol level at the time of his fall, along with a chart detailing the effects of a blood alcohol level similar to that of Mr. Ciberay's.

Here, the Court finds that, while there is no evidence of a history of biased claims administration or inconsistent reasons for denying Plaintiff's claim, there is some indication that Defendant failed to fully investigate relevant aspects of Plaintiff's claim. The Court agrees with Plaintiff that the record lacks any indication that

Defendant researched or applied applicable state laws regulating insurance.[1]

On the other hand, the Court agrees with Defendant that the record demonstrates Defendant thoroughly examined Mr. Ciberay's medical file, including obtaining an "independent medical opinion." Though, other than relying on Mr. Ciberay's blood alcohol level and a list of typical effects associated with such a blood alcohol level, there is no indication that Defendant fully investigated the cause of Mr. Ciberay's fall, which–according to Defendant–is of paramount importance in this case.[2]

Considering the foregoing, the Court concludes Defendant's failure to fully investigate Plaintiff's claim requires the Court to accord moderate weight to Defendant's inherent structural conflict of interest in reviewing Defendant's decision to deny Plaintiff's claim.

**II.    Analysis**

Plaintiff contends the denial of her claim was an abuse of discretion because:

> (1) defendant relied on an unenforceable exclusion in the Policy which violated California's substantive Insurance Law, (2) defendant ignored controlling federal ERISA law, California law and the Plan's and the Policy's express provisions; (3) decedent's intoxication at the time of his fall was not "the" cause of his death 9 days later, (4) defendant ignored the Medical Examiner's findings as to "the" cause of death, and (5) defendant ignored its own forensic pathologist's finding that decedent's intoxication was not "the" cause of death.

---

[1] Defendant asserts there is no evidence in the record as to where the Policy was delivered, thus implying there is no way to determine which state's insurance laws might apply. Rather than excusing Defendant from considering relevant state law, however, the Court finds this is an example of Defendant's failure to fully investigate Plaintiff's claim. Where a state's insurance laws are required to be considered when interpreting a policy such as the one here, the Court finds it unreasonable to, not only fail to ascertain which state's insurance laws might apply, but to also fail to consider how those laws affect the interpretation of the policy. *See Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1464 (9th Cir. 1997) (holding that denial of claim without obtaining relevant information was an abuse of discretion).

[2] The record lacks any clear indication that Mr. Ciberay exhibited any of the purportedly typical effects associated with a blood alcohol level of .422%, which, according to Defendant, include: ataxia, tremors, disorientation, disturbed equilibrium, depressed respiration, unconsciousness, and death. To the contrary, the record indicates Mr. Ciberay was able to move all four extremities on command, was alert and oriented, experienced pain on standing (implying he was able to stand), was breathing normally, was conscious, and was alive. Moreover, prior to his fall, Mr. Ciberay had been playing with his grandson in an upstairs room. Thus, given the apparent contradiction of its generic list of typical effects with Mr. Ciberay's actual state at the time of his fall, the Court finds it was unreasonable for Defendant not to further investigate the cause of Mr. Ciberay's fall. *See Booton*, 110 F.3d at 1464.

Defendant asserts its decision was based upon a reasonable interpretation of the facts, applicable Policy terms, and on substantial evidence in the administrative record. More specifically, Defendant contends "Plaintiff can in no way establish an abuse of discretion by the Plan, namely that it: 1) rendered a decision without explanation, 2) construed provisions of the Plan in a way that conflicts with the plain language of the Plan, or 3) relied on clearly erroneous findings of fact."

### A.    Applicability of State Law

Plaintiff asserts Defendant was legally and contractually bound to consult with and apply California insurance law, but failed to do so. Specifically, Plaintiff asserts California Insurance Code Section 10369.12, which sets forth a standard intoxication exclusion provision, supplants the Policy's intoxication exclusion. And that, under the statutory provision, Defendant should have approved Plaintiff's claim despite Mr. Ciberay's intoxication at the time of his fall.

Defendant asserts "Plaintiff's argument is flawed because even if the Insurance Code's language applies, the medical evidence within the Administrative Record reasonably supports that Mr. Ciberay's death was in consequence of his intoxication." Thus, Defendant does not deny that it should have considered the California Insurance Code in assessing Plaintiff's claim. Defendant asserts only that, even if considered, the Insurance Code does not compel a different result. Defendant further asserts that, "even if the Insurance Code is read into the Policy, the *interpretation* of that language in a policy forming part of plan governed by ERISA is a matter to be decided under federal law, not state law or state decisions."

ERISA generally preempts state laws "insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Saved from preemption is "any law of any State which regulates insurance." *Id.* § 1144(b)(2)(A). This concept is reflected in the Plan's language, which provides that "ERISA does not pre-empt state laws that regulate insurance."

Additionally, the Policy provides that it "is governed by the laws of the state in which it is delivered." While Defendant correctly notes there is no specific reference to where the Policy was delivered, the Court is willing to infer–based on the fact that Plaintiff lived and worked in California–that the Policy was also delivered in California. The Court is further willing to make this inference because Defendant does not deny that it should have considered the California Insurance Code in assessing Plaintiff's claim. Thus, the Court concludes the Policy is governed, and must be construed in accordance with, California laws that regulate insurance.

## B.    California Insurance Code

There is no dispute that California Insurance Code Sections 10369.1 through 1369.12 regulate insurance, or that the Policy is subject to those provisions. *See Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1249 (C.D. Cal. 2003) ("Accidental death policies . . . fall within the definition of 'disability insurance' under the Insurance Code.") (*citing, inter alia*, Cal. Ins. Code § 106).

Section 10369.1 provides in relevant part:

> no disability policy delivered or issued for delivery to any person in this State shall contain provisions respecting the matters set forth in Sections 10369.2 to 10369.12, inclusive, unless such provisions are in the words in which the same appear in such sections; provided however, that the insurer may, at its option, use in lieu of any such provision a corresponding provision of different working approved by the commissioner, which is *not less favorable* in any respect to the insured or the beneficiary.

(Emphasis added.)

Section 10369.12 is thus one of eleven standard provisions that must be directly inserted into insurance policies delivered in California unless the insurer gets approval from California's insurance commissioner to use alternate, though not less favorable, wording. Section 10369.12 provides:

> Intoxicants and controlled substances: The insurer shall not be liable for any loss sustained or contracted *in consequence of* the insured's being intoxicated or under the influence of any controlled substance unless administered on the advice of a physician.

14

(Emphasis added.)

Applying Section 10369.1, the Court concludes the language of Section 10369.12 differs from the Policy's intoxication exclusion because, while Section 10369.12 excludes "any loss sustained or contracted in consequence of the insured's being intoxicated," the Policy's excludes "any loss caused in whole or in part by, or resulting in whole or in part from, . . . The Insured Person being under the influence of drugs or intoxicants."

Thus, the next issue under Section 10369.1 becomes whether the Policy's intoxication exclusion is less favorable than the language set forth in Section 10369.12. If the Policy's exclusion is less favorable than the language provided in Section 10369.12, then the statutory language should be substituted in place of the Policy language. *See Smith v. Stonebridge Life Ins. Co.*, 582 F. Supp. 2d 1209, 1220 (N.D. Cal. 2008) ("[T]he statutory language controls if the Policy's language is 'less favorable' to insureds.") (*citing Olson v. American Bankers Ins. Co.*, 30 Cal. App. 4th 816, 828 (1994)).

The answer to whether the Policy language is less favorable than the statutory language is clear. A loss that is caused/resulting "in whole or in part" from the insured's being intoxicated is more expansive than a loss that is "in consequence of" the insured's being intoxicated. Accordingly, under the Policy's language, Defendant is able to deny more claims than it would be able to under the statutory language. Thus, the Court will replace the Policy's intoxication exclusion with the statutory language of Section 10369.12. This conclusion alone dictates a finding that Defendant abused its discretion by failing to consider the appropriate standard in considering Plaintiff's claim. Given Defendant's assertion that this failure was harmless error, however, the Court will go on to apply the language of Section 10369.12 to the facts set forth in the record.

The next question thus becomes how the Court should interpret Section 10369.12's "in consequence of" term. While Plaintiff would resort to California case

law, Defendant would not.  Instead, relying on *Evans v. Safeco*, 916 F.2d 1437 (9th Cir. 1990), Defendant asserts that, once read into the Policy, the term must be interpreted according to "uniform federal common law."

The Court rejects Defendant's assertion because, in *Evans*, the Ninth Circuit was tasked with interpreting the word "children" in an insurance policy.  Holding that interpretation of an ERISA insurance policy is governed by a uniform body of federal common law, the Ninth Circuit interpreted the word "children" to exclude a former spouse's child.   Nowhere in *Evans*, however, did the Ninth Circuit address the interpretation of a California statute regulating insurance that must be read into an ERISA insurance policy.   How, then, should this Court interpret the "in consequence of" term?

In *Cisneros v. UNUM Life Insurance Company of America*, the Ninth Circuit declined to formulate a rule of federal common law based on a state law regulating insurance because "the federal common law [courts] are directed to formulate must follow from preemption, not from a conclusion that the law is saved from preemption." 134 F.3d 939, 947 (9th Cir. 1998), *cert denied*, 526 U.S. 1086.  Here, the "in consequence of" term is derived from a law that is "saved from preemption."  Thus, in the Court's view, this militates against interpreting the "in consequence of" term according to federal common law as Defendant would have the Court do and, instead, suggests that the statutory term should be interpreted according to California case law. *See Anderson v. Continental Casualty Co.*, 258 F. Supp. 2d 1127, 1131 (E.D. Cal. 2003) (resorting to California case law to determine whether a California common law rule regulates insurance) (*citing Willden v. Washington Nat'l Ins. Co.*, 18 Cal. 3d 631, 635 (1976)).  The Court thus turns to California law to interpret the "in consequence of" term.

In *Olson*, *supra*, the insured drowned face down in her home bath tub, after which an autopsy revealed a .14 mg/dL blood alcohol level with therapeutic amounts of Diazepam, commonly sold under the trade name Valium.  30 Cal. App. 4th 816.  The

insurer denied a claim for benefits under the policy's intoxication exclusion, and a jury trial followed.  The trial court instructed the jury that the statutory language of Section 10369.12 applied and that it should interpret the term "in consequence of" to mean "the proximate cause."   The California Court of Appeal approved the trial court's interpretation.  *Id.* at 830-31.  In so doing, the court relied on *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal. 3d 395 (1989), in which the California Supreme Court "noted that, in previously characterizing the 'but for' clause of [another statute regulating insurance], it had impliedly recognized that 'coverage would not exist if . . . an excluded risk was the efficient proximate cause (meaning predominant) cause of the loss.'"  *Olson*, 30 Cal. App. 4th at 830 (*quoting Garvey*, 48 Cal. 3d at 402-03).  Thus, in applying the language of Section 10369.12, the Court will interpret the "in consequence of" term to require the insured's intoxication to be the "efficient proximate cause" of the loss in order for the loss to be excluded.[3, 4]

The California Supreme Court has explained that the "efficient proximate cause" is the cause "that sets the others in motion."  *Sabella v. Wisler*, 59 Cal.2d 21, 31-32 (1963).  It is the "cause to which the loss is to be attributed, though the other causes may follow it, and operate more immediately in producing the disaster."  *Id.*  Thus, "where there is a concurrence of different causes, the efficient cause—the one that sets the others in motion—is the cause to which the loss is to be attributed, though the other

---

[3] To the extent necessary, the Court adopts this interpretation as a rule of uniform federal common law.  *See Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 386 (9th Cir. 1994) ("ERISA preemption does not mean that general principles of state law are irrelevant to interpretation of ERISA-governed insurance contracts.  On the contrary, the courts are directed to formulate a nationally uniform federal common law to supplement the explicit provisions and general policies set out in ERISA, referring to and guided by principles of state law when appropriate, but governed by federal policies at issue." (internal quotation marks omitted)).

[4] Courts interpreting statutes and policies containing intoxication exclusion with the "in consequence of" language have reached similar conclusions. *See, e.g.*, *Cabernoch v. Union Labor Life Ins. Co.*, 2009 WL 928998, at *5 (N.D. Ill Apr. 6, 2009) (interpreting "in consequence of" under Illinois law to require a showing that "intoxication was the sole proximate cause of the injury" to justify excluding coverage); *Rivers v. Conger Life Ins. Co.*, 229 So. 2d 625, 627-28 (Fla. Dist. Ct. App. 1969) ("The words 'in consequence of being intoxicated' mean that a causative connection between intoxication and death must be shown if coverage is to be denied."); *Interstate Life & Accident Ins. Co. v. Gammons*, 56 Tenn. App. 441, 446 (1966) ("insurer excepted from liability only if it proves insured's intoxication was 'the', not 'a', proximate cause of death").

causes may follow it, and operate more immediately in producing the disaster." *Id.* Still, "the fact that an excluded risk contributed to the loss would not preclude coverage if such a risk was a remote cause of the loss." *Garvey*, 48 Cal. 3d at 402-03.

### C.   Federal Causation Cases

Other federal courts have interpreted policy exclusions to require proof of a causative connection between an insured's excluded state (e.g., intoxication, illness, etc.) and the insured's loss. The Court finds these cases instructive with regard to the degree of causation required in deciding whether Mr. Ciberay's intoxication was the efficient proximate cause of his death.

In *Hastie v. J.C. Penney Life Insurance Company*, the insured died after colliding with a vehicle that had switched into his lane. 115 F.3d 895, 896 (11th Cir. 1997). The death certificate listed "multiple blunt traumatic injuries" as the immediate cause of death, "motorcycle-motor vehicle accident" as the "underlying cause of death" and "acute alcohol intoxication" as a "significant condition contributing to death but not resulting in the underlying cause," as the insured's blood alcohol level was measured at .254 at the time of his autopsy.

The insurer denied a claim for accidental death benefits by the insured's wife under two insurance policies pursuant to the policies' intoxication exclusions. One exclusion provided, "[n]o benefit shall be paid for Loss caused by or resulting from . . . an Injury occurring while the Covered Person is intoxicated . . . ." The other exclusion provided "[n]o benefit shall be paid for any loss . . . which is caused by or results from . . . an Injury occurring while the Covered Person is intoxicated." The insurer argued that the insured's *status* as intoxicated triggered the exclusions. The Eleventh Circuit rejected the insurer's argument as unreasonable, finding the case was similar to a Florida case, in which the Florida Supreme Court required some proof of a causal connection between an insured's intoxication and his death.

In *Kellogg v. Metropolitan Life Insurance Company*, the insured crashed into a tree and later died at the hospital. 549 F.3d 818 (10th Cir. 2008). A witness who

observed the accident stated she noticed the driver appeared to be having a seizure before veering into the tree.  The medical examiner concluded the insured suffered a "subarachnoid hemorrhage" and a "basilar skull fracture" from a "solo motor vehicle accident."   The autopsy further revealed that the insured had Bupropion in his bloodstream at the time of his death and that this drug had a reported risk factor of seizures.

The insurer denied a claim for accidental death benefits pursuant to the policy's physical illness exclusion.  In deciding whether the insured's death was "caused" by his apparent seizure, the Tenth Circuit concluded "the car crash—not the seizure—caused the loss at issue, i.e., [the insured's] death."  The court thus concluded that the exclusionary clause of the policy did not apply.  549 F.3d at 829.  In reaching its conclusion, the court relied on *Vickers v. Boston Mutual Life Insurance Co.*, 135 F.3d 179 (1st Cir. 1998).

In *Vickers*, the insured had a heart attack while driving and died after crashing into a tree.  The insurer denied coverage under the policy's illness exclusion, even though the death certificate listed the cause of death as "[m]ultiple blunt force traumatic injuries secondary to motor vehicle accident precipitated by acute coronary insufficiency."  In reversing the denial of benefits, the Court concluded that while the heart attack caused the crash, the crash was the sole cause of death.  135 F.3d at 181-82.

Similarly, in *Johnson v. Life Investors' Insurance Co.*, 98 Fed. Appx. 814 (10th Cir. 2004), the insured (who had muscular dystrophy and a history of falls) fell down a set of stairs and broke his neck.  After admission to the hospital, the insured developed pneumonia and died.  The insured's immediate cause of death was "pneumonia due to, or as a consequence of, a cervical spine fracture, and the underlying cause of death [w]as myotonic dystrophy."  The insurer denied coverage under the policy's physical illness exclusion.  In reversing the denial of coverage, the Tenth Circuit concluded "it is undisputed that the immediate cause of [the insured]'s

1  loss was a fall, it is irrelevant under the terms of the this policy whether the fall was

2  caused by his myopic [*sic*] dystrophy." *Id.* at 818.

3          **D.**    **Application of Intoxication Exclusion**

4       Here, the Court first notes that it views Defendant's denial of benefits with a

5  moderate amount of skepticism per its inherent structural conflict of interest, as set

6  forth in Discussion Section I(B)(2), above.

7       Considering the facts of this case, along with the statutory language of Section

8  10369.12, the Court concludes the record contains insufficient evidence for Defendant

9  to have reasonably concluded that Mr. Ciberay's death was "in consequence" of his

10  intoxication.  In the first instance, there is insufficient evidence to reasonably conclude

11  that Mr. Ciberay's intoxication caused his fall.  But, even assuming there were

12  sufficient evidence to reach that conclusion, Mr. Ciberay's intoxication was too remote

13  from his death to reasonably conclude his intoxication was the efficient proximate

14  cause of his death.

15       The medical examiner's amended report, along with the opinion of Defendant's

16  independent forensic pathologist, makes clear that Mr. Ciberay very likely died of a

17  pulmonary embolism.  The pulmonary embolism was very likely due to Mr. Ciberay's

18  decreased mobility.  Mr. Ciberay's decreased mobility was due to his pelvic fractures.

19  Mr. Ciberay's pelvic fractures were due to his fall.  And while one may argue, as

20  Defendant does here, that Mr. Ciberay's intoxication was the efficient proximate cause

21  of his death because it began the chain of events leading to his death, there is simply

22  insufficient evidence to reasonably conclude Mr. Ciberay's intoxication caused him to

23  fall.

24       Other than a generic list of the typical effects associated with a blood alcohol

25  level similar to that of Mr. Ciberay's at the time of his fall—which, importantly,

26  appears to be entirely contradicted by Mr. Ciberay's activity before falling and by his

27  disposition when paramedics arrived as set forth in Footnote 2 above—one may only

28  speculate as to what actually caused Mr. Ciberay to fall.  The fall may have been, as

3:12-cv-01218-GPC-MDD

Plaintiff posits, related to the type of footwear Mr. Ciberay was wearing (if any), the type of flooring on the stairs, the fact that Mr. Ciberay was carrying dishes, or any combination of these and other factors.  In short, Defendant relies on the fact that Mr. Ciberay was intoxicated without sufficiently tying Mr. Ciberay's intoxication to his death.

Furthermore, the Court finds the facts of this case analogous to those in *Hastie*, *Kellogg*, *Vickers*, and *Johnson*.  That is, given the medical examiner's conclusion that Mr. Ciberay's death was caused by "complications following pelvic fractures" with his "alcohol abuse" (not intoxication) being only a contributing factor to his death, the Court concludes Defendant could not have reasonably decided Mr. Ciberay's intoxication was the efficient proximate cause of his death.  Therefore, the intoxication exclusion does not apply.

## CONCLUSION

For the foregoing reasons, the Court must reverse Defendant's denial and enter summary judgment in favor Plaintiff.  Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is **DENIED**, and Plaintiff's Motion for Summary Judgment is **GRANTED.**  Defendant's denial of Plaintiff's claim for benefits under the Policy is therefore **REVERSED**.  The Clerk of Court is thus directed to enter judgment in favor of Plaintiff in the amount of $620,000.

DATED:  June 10, 2013

HON. GONZALO P. CURIEL
United States District Judge